UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

James Nekich,

    Plaintiff,

v.

Wisconsin Central Limited,
a Delaware corporation,

    Defendant.

Case No. 16-cv-2399 (JNE/DTS)
ORDER

Plaintiff James Nekich ("Nekich") asserted violations of the Family Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), and the Age Discrimination in Employment Act ("ADEA") against his former employer, Defendant Wisconsin Central Limited ("Wisconsin Central"). Defendant moved for summary judgment on all three claims. For the reasons set forth below, the motion is granted in part and denied in part.

## I. BACKGROUND

Nekich began working for Wisconsin Central as a Rail Traffic Controller ("RTC") in June 1999. RTCs oversee the safe and efficient movement of trains and railway personnel. They also track train crew hours to ensure that they do not exceed statutory maximum amounts. If a crew is approaching the end of its permitted hours, the RTC notifies his or her chief dispatcher, and the dispatcher then works with other supervisors

1

to coordinate a "recrewing." The RTC then radios those recrewing instructions to the crews.

Nekich was approved for intermittent FMLA leave for anxiety in October 2013 and again in November 2014. On December 17, 2014, Nekich had a flare-up of his anxiety and notified his supervisor of his intent to use FMLA leave. The request was approved and Nekich was not disciplined for missing time. Nekich had also used FMLA for other conditions in previous years without incident. *See* Def.'s Mem. Supp. Summ. J. 4.

On January 1, 2015, Nekich arrived at work for his morning shift. By that time, there was already significant congestion involving the trains under his control. Morehouse Dep. 116. One of the trains under his watch, the "343" train, was approaching a required recrewing time. Yusef Clements, the Chief Dispatcher, allegedly instructed Nekich to stop the 343 at Ericksburg Road in order to facilitate recrewing. Morehouse Dep. 91. According to Nekich, however, he received no such instruction. Nekich Dep. 158. The 343 train passed by Ericksburg Road without recrewing, and then had to stop at a remote location when its crew's hours expired. ECF 59-4 at 16. This caused delays down the line. Nekich Dep. 181–82.

Shortly after the Ericksburg Road incident, Dennis Anderson, one of Nekich's supervisors, and other Wisconsin Central employees congregated around Nekich's desk, causing him to feel anxious. Nekich Dep. 202, 205. At that point, he went to the lunchroom to "[take] a timeout" and attempt to calm down. Nekich Dep. 205, 213.

2

Nekich then went to the office of Anne Morehouse, the Wisconsin Central Superintendent, and told her that he was "upset" and could not dispatch trains any more that day. Nekich Dep. 219. Nekich acknowledges that he did not "get into details" about his anxiety or FMLA during this exchange with Morehouse. Nekich Dep. 218. He contends that Morehouse told him that if he left work, things would "go badly" for him. Nekich Dep. 220. Morehouse took Nekich out of service and told him that she would let him know when he could come back to work. Nekich Dep. 221. Roughly an hour later, Morehouse sent an email to the company's labor relations office stating that "Nekich was sent home today after refusing to do his job. We will be setting him up for three investigations." ECF No. 59-4 at 24. After leaving work, Nekich went home, took his blood pressure and found that it was high, took medicine, and fell asleep. Nekich Dep. 247–48. Upon waking up a few hours later, he went to the emergency room, where he was given medication for panic attacks. Nekich Dep. 251.

The next day, Nekich contacted Wisconsin Central's Attendance Management Center ("AMC") to request FMLA leave. Nekich Dep. 253. Shortly thereafter, Morehouse notified the AMC team by email that Nekich was not eligible for FMLA because he was out of service pending an investigation. ECF No. 59-4 at 26. Morehouse also indicated by email that she thought Nekich was "going to try to get paid for being off, when he is not eligible too [sic]." ECF No. 59-4 at 26. Later that morning, Senior Chief Thomas Duncan called Nekich to tell him that he was out of service pending multiple investigations. ECF No. 59-4 at 28.

Wisconsin Central held three investigatory hearings on January 15, 2015 to determine whether Nekich had violated any rules during the January 1 incident. ECF No. 59. Testimony was taken from Nekich, Morehouse, Anderson, and other Wisconsin Central personnel. As the most senior manager not involved in the incident, Duncan was responsible for making the decision in Nekich's case. Duncan Dep. 28. He issued his decisions on January 23, 2015. Nekich received a 15-day actual suspension and a 15-day deferred suspension for failing to direct the 343 train to meet its relief crew, a 30-day actual suspension and 30-day deferred suspension for refusing to perform his duties after the Ericksburg Road incident without specific instructions from his supervisors, and a dismissal from service for insubordination and deserting his desk. Nekich appealed the 15/15 decision and the dismissal decision to the Public Law Board through his union. On October 9, 2016, the Board overruled the 15/15 penalty on the grounds that Clements did not testify during the hearing. The Board also reduced the dismissal to a one-year unpaid suspension on the grounds that Nekich was guilty of insubordination but not of deserting his desk. The one-year suspension ran from January 2, 2015 through January 1, 2016. Nekich retired on March 1, 2016 and receives a full pension from the Railroad Retirement Board based on his age and years of service.

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury

4

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court views the record and all justifiable inferences in favor of the non-moving party. *Liberty Lobby,* 477 U.S. at 255.

### III. DISCUSSION

Nekich's complaint asserts claims under the FMLA, the ADA, and the ADEA. Plaintiff elected not to contest Defendant's motion for summary judgment on the ADEA claim. Pl.'s Mem. 1, n.1. The FMLA and ADA claims are discussed below.

#### A. Plaintiff's FMLA Claims

The FMLA entitles eligible and qualified employees to twelve weeks of leave from work during any twelve-month period. 29 U.S.C. § 2612(a)(1). Employers are limited in their ability to undermine an employee's leave by two FMLA subsections. Under Section 2615(a)(1), an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" rights provided under the FMLA. Section 2615(a)(2) prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful" by the

5

FMLA. The Eighth Circuit recognizes three FMLA claims flowing from these subsections: (1) entitlement, (2) retaliation, and (3) discrimination. *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005–06 (8th Cir. 2012). Nekich alleges FMLA claims under the entitlement and discrimination theories.[1]

### 1. Entitlement Claim

"An FMLA entitlement claim arises when an employer denies or interferes with an employee's substantive FMLA rights." *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1015 (8th Cir. 2013). Crucially, for this family of claims, "the employer's intent is immaterial." *Ballato v. Comcast Corp.*, 676 F.3d 768, 772 (8th Cir. 2012). Unlike most other employment claims, therefore, entitlement or interference claims are not analyzed under the *McDonnell Douglas* burden-shifting framework. Instead, an employee's burden for entitlement claims is to "'show only that he or she was entitled to the benefit denied.'" *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006) (quoting *Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003)).

Nekich contends that he was entitled to FMLA leave as of January 1, 2015. Pl.'s Mem. Opp'n Summ. J. 29. There is no dispute that Nekich had been approved for intermittent FMLA leave for his anxiety. However, an FMLA entitlement claim "cannot succeed unless the plaintiff can show that he gave his employer adequate and timely notice of his need for leave." *Chappell v. Bilco Co.*, 675 F.3d 1110, 1116 (8th Cir. 2012) (quoting *Rynders v. Williams*, 650 F.3d 1188, 1196 (8th Cir. 2011)). Defendant contends

---

[1] In his Complaint, Nekich alleges FMLA retaliation as well, Compl. ¶ 70, but his summary judgment response brief expressly states that only the entitlement and discrimination theories are implicated. Pl.'s Mem. 26.

6

that Nekich did not provide this required notice of his need for FMLA leave. Def.'s Mem. 26; Def.'s Reply 5–8.

Nekich's January 2 call to the AMC was timely notice. Under the FMLA's implementing regulations, "When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). The regulations then say that "[w]hen an employee becomes aware of a need for FMLA leave less than 30 days in advance, it should be practicable for the employee to provide notice of the need for leave either the same day or the next business day." 29 C.F.R. § 825.302(b) (emphasis added). The Eighth Circuit has embraced this approach in cases involving both unforeseeable and foreseeable FMLA leave requests. *See Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008); *Spangler v. Fed. Home Loan Bank of Des Moines,* 278 F.3d 847, 852 (8th Cir. 2002). Thus under both the FMLA's regulations and Eighth Circuit case law, notice that is provided the next business day meets the "as soon as practicable" requirement. Nekich's January 2 call to the AMC thus qualifies as timely notice.

As to whether Nekich's January 2 call to the AMC was *adequate* notice, this is a question of fact more appropriate for a jury. *See Phillips*, 547 F.3d at 909 ("Whether an employee gave sufficient information to put his or her employer on notice that an absence may be covered by the FMLA is a question of fact for the jury."). Adequate notice requires "'enough information to put the employer on notice that the employee may need

7

FMLA leave.'" *Chappell*, 675 F.3d at 1116 (quoting *Thorson v. Gemini, Inc.*, 205 F.3d 370, 381 (8th Cir. 2000)). However, an employee "need not invoke the FMLA by name in order to put an employer on notice that the Act may have relevance to the employee's absence from work." *Thorson*, 205 F.3d at 381. Viewed in the light most favorable to Nekich, the evidence suggests that he likely provided adequate notice when he called the AMC on January 2, 2015. At a minimum, it reveals that there is a genuine issue of material fact. Summary judgment on the entitlement claim is therefore not appropriate.

### 2. Discrimination Claim

An FMLA discrimination claim occurs when "an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA." *Pulczinski*, 691 F.3d at 1006. Absent direct evidence of discrimination, the claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *Hager*, 735 F.3d at 1016. That familiar approach requires the employee to first make a prima facie case for discrimination by showing: "(1) that he engaged in activity protected under the Act; (2) that he suffered a materially adverse employment action, and (3) that a causal connection existed between his action and the adverse employment action." *Pulczinski*, 691 F.3d at 1007. If the employee is successful, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its challenged actions. Should the employer provide such a reason, the employee then has the opportunity to prove pretext – that is, to show that "'the proffered reason is not the true reason for the employment decision.'" *Stallings*, 447 F.3d at 1052 (quoting *Wallace v. DTG Operations, Inc.*, 442

F.3d 1112, 1120 (8th Cir. 2006)). Pretext can be demonstrated either by showing that "the employer's explanation has no basis in fact," *Stallings*, 447 F.3d at 1052, or by "persuading the court that a discriminatory reason more likely motivated the employer." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

### (a) Prima Facie Case

The parties appear to agree that Plaintiff has satisfied the first two elements of his prima facie case, leaving only the question of causation in dispute. One way that an employee can show causation is by demonstrating that the "temporal proximity" between his protected conduct and the employer's adverse action is "very close." *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (per curiam) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001); *see also Sisk v. Picture People, Inc.,* 669 F.3d 896, 900–01 (8th Cir. 2012); *Hite v. Vermeer Mfg. Co.,* 446 F.3d 858, 866 (8th Cir. 2006). The Eighth Circuit has held that "very close" can mean "a matter of weeks" between the protected conduct and the adverse action. *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1113 (8th Cir. 2001); *see also Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 833 (8th Cir. 2002) (finding that the time between a January 1 leave and a January 14 termination was sufficient to establish causation). Here, Nekich successfully demonstrates causation via a temporal proximity theory. He left work on January 1, and was disciplined on January 23. This timeframe fits within the definition of "very close."

### (b) Legitimate, Non-Discriminatory Reason

With Nekich having established a prima facie case, the burden shifts to Wisconsin Central to show that it had a legitimate, non-discriminatory reason for its adverse action. This burden "is not onerous and the showing need not be made by a preponderance of the evidence." *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 860 (8th Cir. 2005). Wisconsin Central clears this bar. Nekich was taken out of service pending three investigations of his conduct related to the January 1, 2015 incident at Ericksburg Road. Three hearings were held on January 15, 2015, and the decisions were transmitted to Nekich on January 23, 2015. Nekich was assessed two suspensions and a dismissal based on his conduct on the day in question.[2] Under the modest standards for demonstrating legitimate, non-discriminatory reasons, Wisconsin Central has successfully met its burden.

### (c) Pretext

The remaining issue is whether Wisconsin Central's reasons for disciplining Nekich were pretextual. Nekich advances five pretext theories: (1) the investigation into his January 1 conduct was a "sham"; (2) Morehouse altered a document that was entered into evidence at Nekich's hearings; (3) Wisconsin Central offered competing explanations for his termination; (4) his supervisors shifted blame as to who made the termination decision; and (5) Morehouse was engaged in a "campaign" against FMLA users. Pl.'s Mem. 33–38. As set forth below, all of these theories fall short of showing that the basis for Nekich's discipline was pretextual.

---

[2] As noted earlier, the Public Law Board overturned the 15-day suspension and reduced Plaintiff's dismissal to a one-year unpaid suspension.

*Sham Investigation*

Plaintiff's first argument for pretext centers on a set of procedural irregularities associated with his disciplinary hearings. Most notably, email records suggest that Duncan (the Wisconsin Central employee tasked with rendering a decision in Nekich's case) may have issued his disciplinary ruling without conducting a full review of the written hearing transcripts. Pl.'s Mem. 35; ECF No. 59-4 at 34; ECF No. 59-1 at 18; ECF No. 59-1 at 10; ECF No. 59-1 at 12. Moreover, Duncan testified that he could not recall whether he reviewed all of the tapes and exhibits from the hearings prior to rendering his decision. Duncan Dep. 52–53. The Public Law Board also found procedural defects in its review of the Nekich hearings. Pl.'s Mem. 35. Plaintiff contends that, taken together, this evidence reveals pretext by showing that his disciplinary hearings were a "sham." Pl.'s Mem. 34.

Pretext can be proven by showing that an investigation or other disciplinary process functioned merely as a cover for discriminatory action. *See McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 700 (8th Cir. 2003) (explaining that probative evidence that an employer's hiring process was a sham can create a genuine issue as to whether the nondiscriminatory reason was pretextual). However, courts afford considerable deference to an employer's business judgments and decisions. *See Hanebrink v. Brown Shoe Co.*, 110 F.3d 644, 646 (8th Cir. 1997) ("[W]e emphasize that employers are free to make their own business decisions, even inefficient ones, so long as they do not discriminate unlawfully."). Therefore, the employee must do more than just show that the process was

"poorly conducted." *Roeben v. BG Excelsior Ltd. P'ship*, 545 F.3d 639, 643 (8th Cir. 2008) ("Even if [the plaintiff] could show that the [defendant's] investigation was poorly conducted or that its decision was impetuous, that alone would not allow him to survive summary judgment."). The employee's claims must also go well beyond mere disagreement with the investigation's outcome or result. *See Pulczinski*, 691 F.3d at 1004 ("It is not our province to determine whether the employer's investigation of alleged employee misconduct reached the correct result, so long as it truly was the reason for the plaintiff's termination.").

Plaintiff's allegation that Wisconsin Central's disciplinary investigation was a "sham" does meet this standard. Even resolving all of the justifiable inferences in favor of Plaintiff – most notably, the claim that Duncan made his decision before reviewing all of the evidence – there is still no genuine issue as to whether the process itself was pretextual. Duncan's alleged failure to read all of the transcripts and exhibits, even if true, may point toward the idea that the hearings were "poorly conducted," but not that they were an elaborate cover for the company's discriminatory termination decision. *See Roeben*, 545 F.3d at 643. Likewise, while the Public Law Board's review of the hearings is critical of certain aspects of the process, there does not appear to be anything in that assessment that would enable a reasonable jury to conclude that the hearings were merely a pretext for Wisconsin Central's discriminatory actions. *See* ECF No. 59. The decisions may have been unsound, but Plaintiff has not provided sufficient evidence that they were pretextual.

*Alteration of Evidence*

Plaintiff also seeks to cast doubt on Defendant's proffered explanation for his termination by pointing to Morehouse's alteration of Clements' prepared written statement before it was submitted to the investigatory hearing. Pl.'s Mem. 36. The record shows that Clements emailed his statement to Morehouse on January 14, 2015, and that Morehouse returned an edited version of the statement to Clements by email later that day. ECF 59-1 at 14-16. Relying on *Zacharias v. Guardsmark, LLC,* 2013 WL 136240 (D. Minn. Jan. 10, 2013), Plaintiff argues that the changes that Morehouse made signal pretext. But in *Zacharias*, the employer appears to have brazenly changed the employee's performance evaluation form after her termination from "recommended for re-employment" to not recommended. 2013 WL 136240 at *7. Here, by contrast, the changes that Morehouse made were superficial and stylistic. Plaintiff does not point to any specific evidence that would allow a jury to infer discriminatory intent from those alterations.

*Shifting Reasons for Termination*

Plaintiff further attempts to prove pretext by arguing that Wisconsin Central's explanation for his termination changed. Pl.'s Mem. 36. Specifically, he notes that Wisconsin Central's original basis for Nekich's dismissal (in its January 23, 2015 notice) was his failure to return to work, but that Duncan's deposition testimony on July 17, 2017 indicated that the termination was based on a combination of the three charges under investigation (the Ericksburg Road incident, refusal to perform his duties, and

insubordination and desertion). Pl.'s Mem. 36; see Duncan Dep. 48. While it is true that pretext can sometimes be proven if "the employer changed its explanation for why it fired the employee," *Stallings*, 447 F.3d at 1052, these shifting reasons must represent a "substantial change in [the employer's] story." *Phillips*, 547 F.3d at 913 (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 835 (8th Cir. 2002)). Here, there is no evidence that the change was substantial. Even if Plaintiff's interpretation is correct and Duncan's three-incident explanation represented a shift from Wisconsin Central's original reason, this adjustment was not substantial because Wisconsin Central was "not changing [its] initial justification, merely adding to it." *Phillips*, 547 F.3d at 913.

### *"Hot Potato"*

Along similar lines, Plaintiff attempts to prove pretext by showing that Defendant has failed to identify which of Nekich's supervisors was actually responsible for his termination. Specifically, he contends that there is an inconsistency between Duncan's deposition testimony, in which he stated that he merely "recommended" termination to Morehouse, Duncan Dep. 47–48, and Defendant's summary judgment brief, which describes Duncan as being responsible for "determining whether Nekich would be disciplined." Def.'s Mem. 14. Plaintiff argues that this amounted to a game of "hot potato," which is evidence of pretext. *Zacharias*, 2013 WL 136240 at *6 ("A jury could reasonably determine that her supervisors' game of 'hot potato' was an attempt to dissemble for discrimination."); *see also Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997) (concluding that inconsistent statements regarding "who was actually

responsible for the decision to fire" revealed a genuine issue as to the proffered reason for termination).

Plaintiff's "hot potato" theory is not well supported. While it is true that Duncan did use the word "recommend" in his deposition, Duncan Dep. 47, the balance of the evidentiary record strongly suggests that this "recommendation" was in fact a decision. For example, elsewhere in his testimony, Duncan says that it was his job to "assess discipline" in the Nekich case, Duncan Dep. 38, and to "rule a decision on the case." Duncan Dep. 48. Additionally, Duncan testified that he never spoke with Morehouse about the Nekich case after the January 1 incident. Duncan Dep. 46–47. Lastly, Morehouse testified that she did not participate in any way in the decision to terminate, and that the decision (which she called a "recommendation") was made by Duncan alone. Morehouse Dep. 235–37. Indeed, even accepting as true Plaintiff's allegation that Duncan merely advised Morehouse, it is difficult to see how a reasonable jury would find this to be pretextual. In the *Zacharias* case upon which Plaintiff relies, the employee's supervisors quite literally blamed each other for the termination decision. Here, there is no such finger-pointing; at most, under Plaintiff's theory, Morehouse *agreed* with Duncan's decision. This is not the kind of "hot potato" scenario that would give rise to a genuine issue regarding the termination decision.

*Campaign Against FMLA Users*

Lastly, Plaintiff tries to establish pretext by showing that Morehouse and other Wisconsin Central managers engaged in a "vigorous campaign against individuals who

used FMLA." Pl.'s Mem. 37. Plaintiff's principal evidence for this is that there was a poster decrying "FMLA Abuse" outside of the entrance to the company's Regional Operations Center. Pl.'s Mem. 37; ECF No. 59-2 at 26. He also points to an August 2013 email in which Morehouse advised RTCs that they should schedule medical appointments outside of normal working hours, and that any days missed for such appointments would be unpaid, "including those covered by FMLA." Pl.'s Mem. 37; ECF No. 59-3 at 2. Morehouse also testified that she and other managers were concerned about FMLA abuse. Morehouse Dep. 274.

This conduct does not prove pretext. Courts presented with charges of discriminatory intent must differentiate between "discriminatory animus in the decisional process" and statements or actions "unrelated to the decisional process." *Saulsberry v. St. Mary's Univ. of Minnesota*, 318 F.3d 862, 867 (8th Cir. 2003) (quoting *Mohr v. Dustrol, Inc.*, 306 F.3d 636, 640–41 (8th Cir. 2002)). Here, Morehouse testified that the "FMLA Abuse" flyer was put up at the request of Wisconsin Central's employees, not its managers, who were troubled by their co-workers' unexcused absences. Morehouse Dep. 276-77. Moreover, the August 2013 email cannot reasonably be construed as connected to Nekich's termination. It predated the January 2015 incident by nearly eighteen months, during which time Nekich successfully secured FMLA leave on more than one occasion.

### B. Plaintiff's ADA Claim

ADA claims are also evaluated under the *McDonnell Douglas* framework. *Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 (8th Cir. 2007). To establish a

prima facie case of discrimination on the basis of a disability, Plaintiff must show that he (1) has a disability within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) suffered an adverse employment action as a result of the disability. *Kowitz v. Trinity Health*, 839 F.3d 742, 745 (8th Cir. 2016). Should Plaintiff succeed in in proving his prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Plaintiff must then show that this proffered reason was merely pretextual. *Id.* Here, Plaintiff successfully makes a prima facie case, but fails to prove pretext. Accordingly, his ADA claim fails to survive summary judgment.

Defendant makes two arguments to contest Plaintiff's prima facie case. First, it contends that Nekich was not a "qualified person" because he was unable to perform the "essential functions" of his job when he was "embarrassed" on January 1, 2015. Def.'s Mem. 23.[3] This argument fails. The Eighth Circuit has made clear that while an employee "retains the ultimate burden of persuading the trier of fact that he can perform the essential functions of the job . . . much of the information which determines those essential functions lies uniquely with the employer." *Benson v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1113 (8th Cir. 1995). Here, Defendant merely asserts that Nekich's embarrassment rendered him unqualified, but fails to provide any meaningful support for that claim.

---

[3] The record leaves unresolved whether Nekich was "embarrassed" or "distraught." See Morehouse Dep. 190; Anderson Test. 41. Viewed in the light most favorable to Nekich, the evidence points toward his being distraught. Even if he were merely embarrassed, however, Wisconsin Central's argument would fail for the reasons discussed.

Accordingly, Nekich's alleged inability to work because of embarrassment does not negate his status as a qualified person under the ADA.

Wisconsin Central also argues that Nekich cannot establish causation because neither Morehouse (who ordered his disciplinary hearings) nor Duncan (who made the disciplinary decisions) were aware that Nekich suffered from anxiety. Def.'s Mem. 23. Under Eighth Circuit law, to establish discrimination because of a disability, "the employer must know of [] the disability." *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 313 (8th Cir. 1999). Both Morehouse and Duncan maintain that they were unaware of Nekich's anxiety. Morehouse Dep. 192–196; Duncan Decl. ¶ 3. Moreover, Nekich himself testified that he never directly spoke to either Morehouse or Duncan about his anxiety. Nekich Dep. 87–89. However, as Plaintiff rightly points out, Morehouse and Duncan became aware of Nekich's disability at the very latest during his disciplinary hearings – prior to the adverse action against him. Pl.'s Mem. 45. Therefore, there is sufficient evidence that Nekich's employers knew of his disability prior to carrying out the adverse employment action.

Although Plaintiff clears the prima facie bar, his ADA claim ultimately fails for the same reason as his FMLA discrimination claim: he does not establish that Wisconsin Central's legitimate, nondiscriminatory basis for his discipline was pretextual. Plaintiff does not offer any new arguments for his ADA claim, instead referring the Court to the FMLA section of his brief. Pl.'s Mem. 46. Accordingly, and for the reasons set forth in Section II.A.2, *supra*, the Court finds that Defendant had legitimate, non-discriminatory

reasons for its disciplinary action, and that Nekich's pretext allegations fall short, even when the evidence is viewed in a light most favorable to him.

### III. CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendant's Motion for Summary Judgment [ECF No. 46] is GRANTED IN PART and DENIED IN PART.

2. Count One is DISMISSED WITH PREJUDICE.

3. Count Two is DISMISSED WITH PREJUDICE.

4. Plaintiff's FMLA retaliation and discrimination claims in Count Three are DISMISSED WITH PREJUDICE.

Dated: November 17, 2017

                                                    **s/ Joan N. Ericksen**
                                                    JOAN N. ERICKSEN
                                                    United States District Judge